# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

**WENDY T. HILL**                                                                                         **PLAINTIFF**

**VS.**                                  **No. 3:22-cv-00304 PSH**

**MARTIN O'MALLEY,**[1] **Commissioner,**
   **Social Security Administration**                                              **DEFENDANT**

## ORDER

Plaintiff Wendy T. Hill ("Hill") appeals the final decision of the Commissioner of the Social Security Administration (defendant "O'Malley") to deny her claim for Disability Insurance benefits ("DIB"). Hill maintains the Administrative Law Judge ("ALJ") erred in three ways: (1) failing to find she had additional severe impairments beyond the four severe impairments he assessed; (2) inaccurately assessing her residual functional capacity ("RFC"); and (3) finding that she could return to her past relevant work as a customer complaint clerk and receptionist. The parties have ably summarized the testimony given at the administrative hearing conducted on July 22, 2021. (Tr. 88-138). The Court has carefully reviewed the record, including the medical records, to determine whether

---

[1] Martin O'Malley, appointed as Commissioner of the Social Security Administration on December 20, 2023, is the proper defendant. Fed.R.Civ.P. 25.

there is substantial evidence in the administrative record to support O'Malley's decision. 42 U.S.C. § 405(g). The relevant period under consideration is from January 1, 2019, the alleged onset date, through June 30, 2019, the date her disability insurance expired. Hill was 45 years old at the time of the hearing and had a high school education. At the close of the hearing, the ALJ noted the challenge in considering the six-month relevant period from 2019 more than two years later. ("We're having to look back in time. . ."). (Tr. 137).

The Court finds that the decision of O'Malley is supported by substantial evidence. Therefore, the decision is affirmed and the complaint is dismissed with prejudice.

*The Administrative Hearing:*

In response to questions posed by the ALJ, Hill testified on a number of topics:

*Past relevant work:*

In 2009, she worked as a receptionist, and around that time she also worked as a service representative for Southwestern Bell. She was seated when performing this job and used a telephone and a computer to perform her duties. She missed work at Southwestern Bell due to illness and eventually lost that job due to absenteeism. After obtaining her license, Hill worked as a cosmetologist, a job requiring her to stand, from 2014 to 2020. She also worked part-time work 2019, giving advice at a beauty supply store.

*Symptoms and Diagnoses:*

Over time Hill's symptoms have "gotten much worse." (Tr. 99). Her arms shake, she cannot grasp, she has no feeling from her ankles down, and she cannot walk well. Her treating neurologist, Dr. Alonzo Burba ("Burba") diagnosed polyneuropathy. She was also treated by primary care provider Dr. Mark Ramiro ("Ramiro") and care providers at Chi Arthritis and Rheumatology ("Chi"). Ramiro diagnosed fibromyalgia and she was referred to Chi. She also was diagnosed with lupus, Hashimoto's thyroiditis, high blood pressure, neuropathy, depression, pain, migraines, sleep issues, multiple autoimmune syndrome, and degenerative arthritis. Her headaches were first thought to be migraines but later possibly found to be a sensory reaction. She was having two to three headaches a week in 2019, even with preventative medication. Her headaches sometimes lasted for two full days.

*Medications and Side Effects:*

Hill takes hydroxychloroquine for lupus, Hashimoto's, and immune system issues, hydrochlorothiazide for high blood pressure, Synthroid for thyroid issues, Estradiol for post-hysterectomy issues, Cymbalta for neuropathy and depression, Hydrocodone for pain, Gabapentin, Aimovig injection for migraines, Ambien for sleeping, and uses a cane. She declined injections to treat her arthritis because her mother had a bad experience with this treatment. Side effects included dry eyes, dry mouth, vision problems, swelling of joints, and urinary problems.

*Daily Activities and Limitations:*

Hill stated she was not able to lift comfortably during the relevant period, had trouble standing and walking, and her right leg "would give out" if she sat for too long. (Tr. 117). Difficulty with her hands and the standing requirement prevented her from doing her cosmetology job. She could not sit for six hours in a job setting. Hill obtained a disabled parking tag in 2021. She has a Facebook account and tries to cook on certain days, but "there are days I can't get out of bed." (Tr. 121). She no longer goes to church and no longer serves on the board for the Children's Advocacy Center, resigning in 2019. She drives "much less" than she did, occasionally driving a half mile to Dollar General. (Tr. 123). When working part-time she would lie in bed when not at work.

The ALJ questioned Hill about specific medical records, including Burba's notes from January 2017, August and September 2018, and his medical source statement from April 2021.

Alissa Smith ("Smith"), a vocational expert, described Hill's past relevant work. The ALJ then posed a hypothetical question, asking Smith to consider a hypothetical worker of Hill's age, education, and experience, who could perform sedentary work with the following restrictions: only occasional stooping, crouching, bending, kneeling, or crawling; frequent fingering and handling in the upper extremities; a controlled indoor environment; and inability to use the lower

4

extremities for foot control or pedals. Smith testified that such a hypothetical worker could perform Hill's past jobs as a customer complaint clerk and receptionist. In addition, such a worker could also perform the jobs of document specialist, addresser, and printed circuit board screener. These jobs would also be available if the worker required the use of a cane, according to Smith. If the hypothetical worker was limited to occasional fingering and handling in the upper extremities, Smith identified other jobs the worker could perform, such as callout operator, surveillance system monitor, and telephone solicitor. If the hypothetical worker could sit for only four hours a day, would be absent three or more days a month, or require unscheduled breaks, Smith indicated no jobs would be available. (Tr. 131-137).

*ALJ's Decision:*

In his September 21, 2021, decision, the ALJ determined Hill had the following severe impairments: history of migraine headaches, fibromyalgia, polyneuropathy, and history of Hashimoto's disease. The ALJ found that Hill's hypertension and her history of Epstein-Barr virus were non-severe.

The ALJ found Hill did not have an impairment or combination of impairments that met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that no treating or examining physician had mentioned findings equivalent in severity to the criteria of any listed impairment.

The ALJ found that Hill had the RFC to perform sedentary work with the restrictions which mirrored those detailed in the initial hypothetical question posed to Smith, while also allowing the use of a cane in one upper extremity while ambulating.

The ALJ assessed Hill's subjective allegations, citing the appropriate factors and finding her statements "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 50).

The ALJ discussed the medical evidence, beginning with Hill's treatment in 2014 by Burba, who diagnosed her with polyneuropathy, recent shingles, syncope in the past, and Raynaud's phenomenon. The ALJ cited treatment notes from 2015-2017, when Hill was prescribed medication for neuropathy, migraine headaches, and central sensitization syndrome. The ALJ also noted that physical examinations reflected normal gait and station, normal strength and tone in upper and lower extremities, and normal deep tendon reflexes. Burba continued to treat Hill in August and September of 2018, just a few months before the onset of the relevant period on January 1, 2019. Hill complained of frequent headaches and bilateral leg pain. In October of 2018, Chi evaluated Hill and suspected lupus or auto-immune thyroid.

The ALJ next detailed Hill's treatment by Burba in September 2019, after the relevant period, when she complained of headaches occurring twice weekly. Hill

also reported tingling in her hands which interfered with her work as a hairdresser. On examination, Burba reported abnormal sensation, and he prescribed medication for neuropathy, migraine headaches, and hyperparathyroidism. An EMG was conducted later in September, with Burba finding Hill had suspected autoimmune process and had Raynaud's phenomenon.[2] Burba also reported deficits in Hill's right tibial and right surla nerves, myopathic changes in the proximal muscles especially in the legs, and chronic denervation at C5, L5, and S1.

In March of 2020, Hill was seen at Chi Arthritis and Rheumatology by Alex Matlock, APN ("Matlock"), who reported her serology for autoimmune muscle disease was benign but that she had elevated antibodies. Matlock diagnosed Hill with Hashimoto's thyroiditis, radiculopathy, and other chronic pain. Matlock started Hill on Tylenol 3 for her lower back pain and discontinued Tramadol.

The ALJ next noted three reports from Burba. In his June 2020 headache questionnaire, Burba opined that Hill's headaches affected her ability to work more than one day per week. In November of 2020, Burba reported that Hill's conditions affected her ability to perform any gainful employment for the foreseeable future. And Burba's April 2021 medical source statement indicated Hill had many

---

[2] According to Johns Hopkins medicine website, Raynaud's phenomenon is a problem that causes decreased blood flow to the fingers. The impairment can occur on its own or secondary to other diseases, such as Lupus or thyroid disorders. *See* www.hopkinsmedicine.org/health/conditions-and-diseases/raynauds-phenomenon.

limitations resulting in her being absent from work more than four days a month, as well as needing rest breaks at hourly intervals or less. In June of 2021, Ramiro, a treating physician since 2014, concurred with Burba's April 2021 opinions.

The ALJ then addressed the opinion evidence, including reports from the state agency consultants. While the state expert opined Hill could perform medium level work with postural limitations, the ALJ found her more limited exertionally prior to the date last insured. The ALJ also discussed the opinions offered by Burba and Ramiro "for the period prior to the DLI [date last insured]". (Tr. 50).

The ALJ determined that, through the date last insured, Hill was capable of performing her past relevant work as a customer complaint clerk and receptionist. Further, relying upon the testimony of Smith, the ALJ cited other jobs which Hill could also have performed. Accordingly, the ALJ concluded she was not disabled. (Tr. 44-53).

*Hill's First Claim – the ALJ failed to find she had additional severe impairments beyond the four severe impairments which he assessed.*

The ALJ identified four severe impairments and cited two additional conditions (hypertension and a history of Epstein-Barr virus) as non-severe impairments. Hill contends the ALJ erred in not finding central sensitization syndrome, lupus, and connective tissue disorder as severe impairments at Step 2 of the sequential evaluation. Hill also argues the ALJ misunderstood the nature of

lupus and erred in omitting it from the list of severe impairments. The Court is mindful that the determination at step two is a medical determination, *see Bowen v. Yuckert*, 482 U.S. 137 (1987).

While the ALJ did not assess lupus as either a severe or non-severe impairment, his decision noted that Chi suspected lupus in October 2018. Chi assessed Hill with "mild suspicion of systemic lupus erythematosus, possible auto-immune thyroid." (Tr. 532). Later, in February and June of 2020, Chi's office would question if Hill was suffering from lupus. In February of 2020, Nurse Matlock decided to repeat serology testing "as she has known history of Hashimoto thyroiditis but questions if she should have underlying diagnosis of lupus." (Tr. 522). In June of 2020, Matlock wrote "I question if she could have underlying systemic lupus erythematosus as well she does have positive ANA and Smith antibody positive." (Tr. 507).

In addition to Chi's suspicion of lupus in 2018, Ramiro diagnosed Hill with connective tissue disease in May 2018, repeating a similar diagnosis (mixed connective tissue disease) in August of that year. (Tr. 438, 481). Burba treated Hill for central sensitization syndrome from 2015 to 2017 and described the effects of the impairment in his November 2020 letter. (Tr. 578, 603-605).

Even accepting Chi's "mild suspicion" as a positive diagnosis, there is no error in the ALJ's treatment of the three diagnoses Hill claims should have been found to be severe. Three reasons support this conclusion.

First, there is an absence of medical evidence relevant to the severity of the three cited impairments. The mere diagnosis of an impairment does not demonstrate the impairment is severe.

Second, the medical evidence relevant to the period in question is unremarkable. The ALJ noted as much with regard to lupus, observing both the diagnosis itself was uncertain and that other medical findings pointed away from lupus. For example, the ALJ cited Matlock's March 2020 note finding "no symptoms at this time associated" with lupus. (Tr. 499). Hill explains that the inconsistent lupus findings illustrate the very nature of lupus, which she states waxes and wanes over time. Hill's explanation is a possibility but does not carry her burden of demonstrating a severe impairment during the relevant time frame.[3] Although the ALJ did not discuss connective tissue disease or central sensitization syndrome in detail, Hill has not convincingly established these impairments significantly limited her ability to perform basic work activities during the relevant period. *See* 20 CFR 404.1520(c).

---

[3] O'Malley concedes Hill's symptoms, whether they are tied to lupus or other ailments, have worsened over time. This development does not change the issue before the Court – whether Hill was disabled from January through June of 2019.

Third, the ALJ's failure to identify these three impairments as severe impairments at step two is ultimately of little legal significance. Once the ALJ proceeds past step two, as he did here, the labeling of an impairment as "severe" or "non-severe" has little legal significance because the ALJ must consider all the claimant's impairments in crafting the residual functional capacity. See 20 C.F.R. 416.945(e). Here, the ALJ stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (Tr. 47).

*Hill's Second Claim – the ALJ inaccurately assessed her RFC.*

The ALJ is required to assess the claimant's RFC, which is a determination of the most the claimant can do despite her limitations. *See Brown v. Barnhart*, 390 F.3d 535 (8th Cir. 2004). The ALJ cannot rely solely upon the medical evidence in assessing a claimant's residual functional capacity; instead, the ALJ must evaluate all the evidence in making the assessment. *See Grindley v. Kijakazi*, 9 F.4th 622 (8th Cir. 2021).

Having reviewed the record, the Court finds that the ALJ did not err in assessing Hill's RFC. Specifically, the ALJ did not err in evaluating the medical and opinion evidence, or in assessing Hill's credibility.

First, Hill contends error in assessing the medical evidence regarding lupus. As previously discussed, the ALJ appropriately addressed Hill's symptoms which

may have been lupus-related. Hill also argues her impairments cause pain, stiffness, and swelling in her hands, limiting her ability to finger and handle. She also cites fatigue and migraine headaches which should have resulted in an RFC with more restrictions.[4] The ALJ detailed the medical records, which included two treatment entries during the relevant period.[5] Based upon the medical records, the frequency of treatment during the relevant period, the various diagnoses previously discussed, and the objective findings, the ALJ could assess the medical evidence as he did in arriving at his RFC determination.

Second, the ALJ adequately evaluated the medical opinion evidence. Burba submitted several opinions on Hill's abilities. In November of 2020, he opined in a letter that she was unable to work, citing her painful polyneuropathy, shingles, recurrent syncope, mixed connective tissue disorder, painful Raynaud's phenomenon, central sensitization syndrome, migraine headaches, greater occipital neuralgia, carpal tunnel syndrome, and an abdominal bruit. (Tr. 578). In a clinic

---

[4] The RFC assessed by the ALJ, for sedentary work with numerous restrictions, was much more restrictive than the assessment of the state agency expert, who opined Hill could perform medium work. (Tr. 139-153).

[5] Hill was seen for follow-up at Chi's clinic in January 2019, where the physician's assistant recorded no chief complaint, worsening migraines, flulike symptoms, muscle and back pain, and concerns about weight gain. On exam, Hill was found to have normal gait and station, no swelling of hands or wrists, and she was given Toradol for her migraine and was to follow up in 2-3 months. Lupus was not diagnosed. (Tr. 522-525). The only other encounter during the relevant period was a follow-up visit to Ramiro in March 2019, where he also recorded normal gait, good range of motion and no tenderness in Hill's extremities. Ramiro directed Hill to continue current medications, with a reduction in her Ambien. (Tr. 462-466).

note forwarded to Hill's attorney in April of 2021, Burba noted daily headaches, a variety of autoimmune diseases, lupus, Raynaud's phenomenon, and central sensitization syndrome. (Tr. 585). On that date, Burba also executed a Medical Source Statement reflecting his opinion that Hill was significantly limited. For example, Burba opined Hill could sit for a total of 4 hours in a work day, 30 minutes at one time, and could stand for a total of 1 hour, 10 minutes at one time. He also offered opinions as to hand limitations, the need for unscheduled rest breaks, and that Hill would be absent more than 4 days per month due to her impairments.[6] (Tr. 587-589). Burba submitted a June 2020 headache form in which he opined Hill would miss more than one day per week due to her migraines. (Tr. 560-561). And in March of 2022, Burba updated Chi on Hill's condition. Hill had reported to Burba that her muscles were burning, stinging, and giving out on her. Burba's exam showed lupus-like symptoms, such as stocking glove hypesthesia with ankle jerks consistent with polyneuropathy. (Tr. 10-11).

    The ALJ addressed the opinions offered by Burba and Ramiro as follows:

> The undersigned has carefully considered the opinions of Dr. Burba and Ramiro for the period prior to the DLI [date last insured]. While Dr. Burba examined the claimant in 2014, he did not qualify the present limitations on his treatment forms. Claimant reported that her condition has worsened over the years, and the medical evidence shows that the claimant had earnings during that time. Dr. Burba's treating record in September 2018 indicated that the claimant was working as a hair

---

[6] Ramiro submitted a brief June 2021 statement indicating he first treated Hill in 2014 and agreed with Burba's Medical Source Statement. (Tr. 598).

dresser. It is noted that Dr. Burba's headache assessment in June 2020 was completed one year after the DLI as well as his medical source statement in April 2021. These assessments did not detail claimant's limitations on June 20, 2019. Further, the medical evidence shows that the claimant's lupus has worsened over the years as evidenced by the frequency of medical treatment and by her own admission. The claimant's earning record also show that she was doing work in 2019, and that she was able to drive, prepare her own meals, do some housework, shop by computer, manage her finances, attend church, and spend time with family. On some doctor's visits, her gait was unimpaired, although she stated that she uses a cane.

Although claimant's family physician, Dr. Mark Ramiro, diagnosed the claimant with lupus on November 5, 2018, this diagnosis was negated by Dr. Chi, a rheumatologist who later did the serology testing for the lupus, which showed that results for autoimmune muscle disorder were benign. The undersigned does not find Dr. Ramiro's assessment of lupus to be persuasive based on testing for this condition.

(Tr. 50-51).

The ALJ's consideration of the opinions of Burba and Ramiro was adequate for two reasons. First, these opinions, on their face, do not explicitly state that Hill was disabled *during the relevant period.* Burba's "To Whom It May Concern" letter of November 13, 2020, indicates Hill "has a medical condition that makes it impossible for her to work" and "she is unable to perform any gainful employment for the foreseeable future." (Tr. 785). Burba does not specify when, in his opinion, this condition began. Burba's Clinic Note of April 22, 2021, includes "no work" in his treatment plan, but does not opine when Hill was first unable to work. (Tr. 585).

In the Medical Source Statement from April 22, 2021, a check-box form,[7] Burba notes he first treated Hill in May 2014 but he does not specify the period during which her limitations occurred. Similarly, the Headache Form executed by Burba in June 2020, one year after the DLI, does not provide a time period during which the headaches produced the symptoms cited. (Tr. 560-561). Finally, Burba's March 10, 2022, letter to Chi outlines Hill's status but does not pinpoint a time during the relevant period when the symptoms rendered her unable to work. (Tr. 10-11). Ramiro did not provide his own opinion, simply writing that he first treated Hill in 2014 and agreed with the limitations assessed by Burba on April 22, 2021. (Tr. 598).

The various opinions of Burba, seconded by Ramiro, are not beneficial to the Court since they do not specify that Hill was affected by the limitations assigned to her during the relevant period, from January 1 to June 30, 2019. *See Zeiler v. Barnhart,* 384 F.3d 932, 936 (8th Cir. 2004) (no expert opinion of disability when physician did not opine of claimant's condition during the relevant time period); *Clark v. Saul*, 444 F.Supp.3d 607 (S.D.N.Y. 2020) (opinions from treating physicians did not relate to the relevant time period); and *Hutto v. Colvin*, 2016 WL 4942045 (E.D. Ark. Sep. 14, 2016) (treating physician's check-box opinion dated nearly two years after DLI given minimal weight by the ALJ).

---

[7] Checklist forms, like the one utilized in this instance, with no medical evidence and little or no elaboration, are of limited worth. *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).

15

Second, even assuming that these opinions were applicable to the relevant time frame, the ALJ's consideration was adequate. Under the pertinent regulations, the ALJ is required to discuss, at a minimum, the supportability and consistency of a medical opinion. 20 C.F.R. 404.1520c(b)(2). While the ALJ did not exhaustively discuss supportability and consistency, this may be understandable under the circumstances. As previously noted, Hill was seen only twice during the relevant period for follow-up visits, leaving the ALJ with a sparse record to consider. The ALJ highlighted the inconsistency of the opinions by noting the medical records, and Hill's testimony, reflecting a worsening condition after the relevant period. The ALJ also noted Hill's unimpaired gait was not consistent with the opinions of Burba. The scant medical records at the pertinent time are not in harmony with the retrospective opinions.

Regarding the supportability of the opinions, a physician's own treatment notes are typically relevant to the supportability of the medical opinion. *See, e.g., Dotson v. Saul*, No. 4:20 CV 310 RWS, 2021 WL 2529786, at *5 (E.D. Mo. June 21, 2021); *Jarmon v. Kijakazi,* No. 4:21-CV-00032 BSM/JJV, 2022 WL 55494, at *3 (E.D. Ark. Jan. 5, 2022), report and recommendation adopted sub nom. *Jarmon v. Soc. Sec. Admin.*, No. 4:21-CV-00032-BSM, 2022 WL 1177362 (E.D. Ark. Apr. 20, 2022), aff'd sub nom. *Jarmon v. Kijakazi*, No. 22-2619, 2023 WL 2378523 (8th Cir. Mar. 7, 2023). Burba did not see Hill during the relevant period. A few months

prior to the onset date, in September of 2018, Burba's notes show Hill was working as a hair dresser. The ALJ appropriately noted this, as well as observing that her earnings history showed she was working in 2019.[8] This gap between the benign findings and Burba's opinions is an acceptable rationale for discounting Burba's opinions. The ALJ also cited Hill's daily abilities during the relevant period. The ALJ could find as he did with respect to the supportability of Burba's opinions.

The Court also finds the ALJ's credibility analysis adequate. In evaluating the intensity, persistence, and limiting effects of a claimant's pain or other symptoms, the ALJ must consider all the evidence, including evidence of the following:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms ...; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p. See also 20 CFR 404.1529; *Polaski v. Heckler*, 751 F.3d 943 (8th Cir. 1984) (identifying factors substantially similar to those of Social Security Ruling 16-3p). Here, the ALJ thoroughly analyzed the medical care, noting the timing of the care and the worsening symptoms after the expiration of the

---

[8] Burba's notes from September 2019 include the comment: "Pt. states that this [hands tingling until she massages them] interferes with her work as a hair dresser." (Tr. 406).

17

relevant period. The ALJ also cited Hill's daily activities, including part-time work, during the relevant period. It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. *See Dillon v. Colvin*, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. *See Id.* Here, the ALJ could find as he did with respect to Hill's credibility, and with respect to her RFC.

*Hill's Third Claim – the ALJ erred in finding that she could return to her past relevant work as a customer complaint clerk and receptionist.*

Hill faults the ALJ's Step Four determination that she could perform her past relevant work as a customer complaint clerk and receptionist. There is no error in this regard. While Hill questions whether her past work as a receptionist qualifies as past relevant work under the regulations, there is no argument on whether her work as a customer complaint clerk amounts to past relevant work. According to Smith, the vocational expert, the customer complaint clerk job was sedentary, and a job which Hill could perform based on the initial hypothetical question posed to her from the ALJ. While the Court understands Hill disagrees with the RFC formulated by the ALJ (a disagreement already addressed), Smith's expert testimony amounts

to substantial evidence supporting the ALJ's decision. *Kraus v. Saul*, 988 F.3d 1019 (8th Cir. 2021).

The ALJ found, in the alternative, that there were other jobs which Hill could perform. This determination, a Step Five finding, is also challenged by Hill – "The hypothetical questions were incomplete because they relied on the ALJ's flawed RFC finding." Doc. No. 18, page 20. In essence, this argument is another attack on the RFC determination. For the reasons already stated, this is without merit.

In summary, the Court finds the ultimate decision of O'Malley was supported by substantial evidence. At the administrative hearing, and again in his decision, the ALJ acknowledged Hill's worsening symptoms after the DLI. Still, the ALJ was tasked with determining whether Hill carried her burden of showing her disability during the relevant period. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of O'Malley is affirmed and Hill's complaint is dismissed with prejudice.

IT IS SO ORDERED this 7th day of May, 2024.

_____
UNITED STATES MAGISTRATE JUDGE